DECISION
In this civil action the Attorney-general seeks declaratory and injunctive relief, which would prevent the defendants, The Narragansett Bay Water Quality Management District Commission (hereinafter simply "the Commission") and NETCO Energy Recovery Limited Partnership (hereinafter generally "NETCO-ER"), from executing and implementing a sludge management services agreement. The Attorney-general, who brings this action through his statutory environmental advocate, invokes this Court's jurisdiction under G.L. 1956 (1985 Reenactment) § 9-30-1, etseq. (Uniform Declaratory Judgments Act) and § 10-20-6.
Neither the Court's jurisdiction nor the Attorney-general's standing is contested by the defendants.
The Commission
The Commission was established by P.L. 1980, ch. 342, § 1
as a public corporation of the state, "for the purposes of acquiring, planning, constructing, extending, improving, and operating and maintaining publicly owned sewage treatment facilities in the district." The district includes the City of Providence and those portions of the City of Cranston and portions of the Towns of Johnston, North Providence and Lincoln formerly served by the City of Providence sewage treatment plant as well as the Cities of East Providence, Pawtucket, and Central Falls, the Towns of Lincoln and Cumberland, and certain portions of the Town of Smithfield. The Commission was originally created pursuant to a legislative finding in § 46-25-2(e)," that the most effective and efficient method to combat the discharge of pollutants in the Narragansett Bay is to create (the Commission), to be charged with the acquisition, planning, construction, financing, extension, improvement, and operation and maintenance of publicly owned sewage treatment facilities in (the district), with appropriate provision for a portion of the financing of the activities to be undertaken by the pledging of the full faith and credit of the State of Rhode Island."
"Sewage treatment facility" is defined in § 46-25-3(m) as "any sewage treatment plant, structure, combined sewer overflows, equipment, interceptors, mains, and pumping stations, or other property, real, personal, or mixed, for the treatment, storage, collection, transporting, or disposal of sewage, or any property or system to be used in whole or in part for any of the aforesaid purposes, or any other property or system incidental to, or which has to do with, or the end purpose of which is any of the foregoing." The Commission currently operates the two largest such facilities in the State. The Commission took over the operation of the Field's Point wastewater treatment facility from the City of Providence in 1982. In 1991 the General Assembly ordered the Blackstone Valley District Commission to be merged with and into the Commission. P.L. 1991, ch. 309, § 2. As a result, the Commission acquired the Bucklin Point facility in 1992.
The Field's Point facility is located on approximately 26 acres of land in the City of Providence and serves approximately 360,000 residences and between 5000 and 6000 businesses in Providence, Johnston, North Providence and portions of Cranston and Lincoln.
The Field's Point facility consists of the structures and equipment used for preliminary treatment, primary treatment, secondary treatment and disinfection of wastewater from the district's sewers. Sewage sludge, either primary sludge or waste activated sludge, is a residue from the treatment processes and must be disposed of in some manner through sludge processing. At Bucklin Point, which serves users in East Providence, Cumberland, Lincoln, Pawtucket, Central Falls, and part of Smithfield, the residual sewage sludge had been deposited for forty years in a landfill site located along the shore of the Seekonk River in the Rumford section of East Providence. The landfill is nearing its capacity and can no longer be used as a permanent disposal site for sewage sludge. The Commission currently plans to dispose of sewage sludge from the Bucklin Point facility at the Field's Point facility. It must plan at once to terminate its use of the on-site landfill.
There are two sludge incinerators at the Field's Point facility, but only one is in current use. The Commission plans to dismantle the older incinerator, originally constructed in 1948, and not presently in service. The Commission has been incinerating sewage sludge in a multiple hearth unit incinerator, originally constructed in 1963, since August 1990, pursuant to approvals received from the State Department of Environmental Management and the United States Environmental Protection Agency (EPA) in 1989.
The Commission's sewage sludge incineration at Field's Point is closely monitored and regulated by the Wastewater Management Branch of the United States EPA under the Federal sludge management program, authorized by 33 U.S.C. § 1251, et seq.
(Clean Water Act) and regulated under 40 C.F.R. Part 503 ("the 503 program"). In addition, another branch of the EPA monitors the testing of the air emissions from the Commission's incinerator under 42 U.S.C. § 7414 (Clean Air Act). On August 30, 1994 the Commission received a final permit to operate the multiple hearth incinerator at Field's Point from the EPA.
The two facilities generate approximately 30 to 35 dry tons of sludge per day every day. Of that total, 20 to 25 tons is currently incinerated at Field's Point each day. Any excess is deposited either at the Bucklin Point landfill, temporarily, or, eventually, at the central landfill operated by the Solid Waste Management Corporation. The ash from the incineration process is slurried, dried and deposited at the central landfill as a cover.
NETCO-ER
NETCO-ER is a Delaware limited partnership. Its sole general partner is NETC Energy Recovery Systems, Inc. Both of these entities are affiliates of New England Treatment Company, Inc. ("the Company"), a Rhode Island corporation, which claims to provide non-hazardous sludge disposal services to municipal wastewater treatment plants and certain industries. The Company owns and operates a sludge disposal facility in Woonsocket, which is identified as a back-up site for disposal of the Commission's sludge under the proposed agreement. NETCO-ER has no experience in developing sludge treatment services and will rely on the expertise of its "affiliates," which include the Company, in the execution of the proposed agreement.
The Proposed Agreement
The requirement to dispose of the combined sewage sludge output from Field's Point and Bucklin Point required that the Commission seek a long-term solution to its sludge disposal problems. The Commission needed a guaranteed ability to dispose of at least 30 dry tons per day, a design average of 45 dry tons and a peak capacity of 58 dry tons per day. The Commission had not initially decided between a "public" approach, whereby a contractor would plan, design, permit and construct a facility, which would be purchased and operated by the Commission, after the facility was up and running and satisfied the Commission's requirements, and a "privatized" approach, whereby the contractor would finance, plan, design, permit and construct the facility, which it would own and operate under a long term service agreement with the Commission.
The Commission decided after an intense and extensive review process to accept NETCO-ER's "privatized" proposal. By the time of these hearings that proposal had matured into two proposed agreements. The first is a sludge management services agreement, a draft of which dated August 31, 1994 has been received in evidence as Petitioner's Number 17, together with a draft of Exhibits and Schedules dated August 2, 1994, received in evidence as Petitioner's 18. The other is an "Interim" service agreement, which is a portion of the proposed service agreement.
NETCO-ER agreed, on an interim basis, to shut down the dewatering operation at Bucklin Point and to haul liquid sludge to Field's Point or to one of some other available facilities at off-site locations, pending its construction and installation of an interim emission control system and upgrading the existing multiple hearth unit (MHU) at Field's Point so it would be permitted to process up to forty dry tons of sludge per day. In the meantime, NETCO-ER would take over dewatering and sludge incineration operations at Field's Point. The interim emission control to be applied to the MHU system would consist of a wet electrostatic precipitator to remove particulates, metals and condensed organics from the emission stream and a regenerative thermal oxidizer or other device or process to destroy hydrocarbons and carbon monoxide. Once the MHU has been tested and permitted to incinerate up to 40 dry tons per day, sewage sludge from Bucklin Point would be dewatered and incinerated at Field's Point. There was also some evidence that NETCO-ER would need to replace two belt filter presses which are part of the feeding operation of the MHU.
According to the proposed service agreement, during this interim period NETCO-ER would also construct a new incinerator, which is the original source of this controversy. It would dismantle and remove the unused 1948 incinerator and build in its place a thermal conversion unit (TCU), described with some generality in the proposed Exhibits and Schedules (Petitioner's Exhibit 18). The actual incineration of the sewage sludge would take place in a fluid bed reactor described as state-of-the-art. Auxiliary to the reactor, itself, would be apparatus necessary to bring heated air, sludge, and fuel, as needed, to the reactor, as well as equipment to withdraw combustion products such as ash and exhaust gases from the reactor. Also proposed is the construction of a waste heat boiler to use the heated exhaust gases as a usable energy source through the production of steam under pressure, which will run a condensing steam turbine to generate electricity. The contractor proposes to meet current State and Federal air emission standards through three separate unit operations: a wet venturi scrubber, an after-cooler, and a wet electrostatic precipitator. In addition, NETCO-ER would construct an addition to the existing incinerator building to house the new dewatering and conditioning equipment.
It is proposed that the Commission will lease to NETCO-ER the premises it needs to carry out its sewage sludge processing operations. Generally speaking those premises consist of an interim solids handling facility, the incinerator building, a dewatering and turbine building, and various storage tanks and ash settling tanks. The premises are to be leased by NETCO-ER from the Commission for a term of at least twenty years with extensions, if necessary, of up to twenty-five, but no more, years. NETCO-ER is generally responsible for payment for all utilities, as well as all assessed taxes and insurance applicable to the leased premises, as more fully set forth in the proposed agreement. As lessee, NETCO-ER will be obligated to keep and maintain the premises and the project in good operating order. NETCO-ER will be the owner of the project, which generally refers to the installations used by NETCO-ER in carrying its obligations under the agreement. At the end of the lease the premises and the project become the sole property of the Commission, unless the Commission sooner exercises an option to buy.
NETCO-ER has represented that it proposes to finance the construction of the project through the issuance of bonds by the Rhode Island Industrial Facilities Corporation. The agreement indicates that the revenues payable under the agreement from the Commission to NETCO-ER will be assigned to the bond trustee as security for the payment of the bonds.
The proposed agreement states that NETCO-ER will provide sludge management services to the Commission all day every day for up to 58 dry tons per day of acceptable sludge. The Commission will agree to deliver to NETCO-ER all the acceptable sludge generated by its Bucklin Point and Field's Point facilities, 45 tons of which is to be processed daily through the TCU and any excess is to be disposed of otherwise. The Commission will pay NETCO-ER tipping fees in accordance with an agreed schedule, but in no event less than $4,226,700 annually. The upgraded MHU will serve only as a back-up to the TCU and will not be used while the TCU is in operating condition. The agreement proposes that electricity generated by NETCO-ER will either be consumed by NETCO-ER or sold to Narragansett Electric Company. If permitted, NETCO-ER will sell electricity to the Commission. NETCO-ER will be permitted, at the Commission's discretion, to accept, process and dispose of acceptable sludge, but not scum or skimmings, not generated by the Commission, and NETCO-ER will share tipping fees received for processing of such sludge with the Commission. The Commission will also be entitled to a share of the net cash flow, as defined, to NETCO-ER from the sale of ash produced from operations at the premises.
This summary of the proposed agreement is not intended to be exhaustive. For a comprehensive understanding, the draft itself must be consulted. It is clear, however, that the Commission and NETCO-ER propose to agree that NETCO-ER will lease the current MHU incinerator, upgrade it so it can burn up to 40 dry tons per day of sewage sludge without violating air quality control standard as applied to its stack emissions, and operate it for an interim period as its own property. NETCO-ER will design, build and operate a new TCU incinerator, which will operate as a replacement for the MHU during the period of the service agreement after the interim period, with a capacity to burn up to 58 tons per day.
The Legal Arguments
At first blush the Attorney-general's argument is direct and straightforward. He says the proposed agreement is illegal, because it violates G.L. 1956 (1989 Reenactment) § 23-19-4(b),
as amended. That sub-section reads as follows:
 "The Corporation will prepare and implement a plan for an integrated statewide system of solid waste management facilities which plan shall define the state's disposal needs and define the manner to meet the needs in accordance with the requirements of § 23-19-11(6). Capacity, maximizing the use of source reduction, reuse and recycling at public and private facilities shall be considered when assessing state need. No public facility shall be constructed unless need is established pursuant to the plan. The plan shall be reviewed and adopted as an element of the state guide plan by the state planning Council."
He points out that the defendants here propose to construct a public facility for which need cannot be established pursuant to the plan. The reason such need could not be established is because § 23-19-11(7), as amended in 1992, provides that: "The plan shall not include incineration of solid waste."
The defendants propose to incinerate sewage sludge. Sewage sludge, he contends, is solid waste according to § 23-19-5(9):
 "`Solid waste' means garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded materials, including solid, liquid, semisolid, or contained gaseous material generated by residential, institutional, commercial, industrial, and agricultural sources but does not include solids or dissolved materials in domestic sewage."
The Commission's facilities, which generate sewage sludge would be waste treatment plants and, accordingly, sewage sludge would be solid waste.
To the plaintiff's apparently flawless web of arguments the defendants interpose an array of counter-reasoning. They argue that § 23-19-5(9) does not include the sewage sludge generated by the Commission's facilities, that § 23-19-11(7) applies only to planning by and for the Solid Waste Management Corporation (SWMC) and not to the Commission, which has its own statutory charter; that the NETCO-ER facility is not a public facility referred to in § 23-19-4(b) but is private one; and that §23-19-4(b) cannot be effective until the plan referred to is promulgated by the SWMC and adopted by the state planning Council.
The Solid Waste Management Corporation Act
Although the Attorney-general asks the Court to construe and apply language from the Solid Waste Management Corporation Act (SWMCA) (§ 23-19-1, et seq.) to the Commission, the SWMC was neither made a witness nor called upon to present evidence through its commissioners, officers or agents regarding the construction and application of a relatively complex and frequently amended act. See § 23-19-28. The act created the SWMC in 1974 to respond to extensive legislative finding and to carry out a comprehensive declaration of the policies of the State of Rhode Island. Although the SWMC is not a department of State government, it is "a public instrumentality and agency exercising public and essential governmental functions." §23-19-6(a). The SWMC is vested with extensive powers regarding the disposal of solid waste. In addition to the plan referred to in § 23-19-4(b), the SWMC is charged with extensive planning with respect to resource recovery within the State pursuant to §23-19-11. Solid waste facilities under the jurisdiction of the SWMC are regulated by the department of environmental management according to § 23-19-12.
It is undisputed that the SWMC has never claimed any authority whatever during its entire existence to regulate any of the activities of the Commission at any of its wastewater treatment facilities. The plaintiff acknowledged during the hearing that the Commission's wastewater treatment activity was never subject to regulation or control by the SWMC, nor is it now. The plaintiff does, nonetheless, claim that the Commission and NETCO-ER are subject to the planning authority of the SWMC with respect to the disposal of the sewage sludge generated at its facilities.
"Solid Waste"
A determinative question in this case is whether or not the material, whatever its name, which the defendants now burn and propose to burn in its incinerators in the future is solid waste within the meaning of that term as used in the SWMC. the answer to that question depends on an in-depth analysis of §23-19-5(9), which purports to define "solid waste." First, the definition does not refer specifically to "sewage sludge" of "wastewater sludge" or "wastewater treatment sludge," although those terms more precisely describe what the defendants intend to burn. The definition does refer to three kinds of "sludge," of which only one is pertinent: "from a waste treatment plant."
The defendants contend that the General Assembly never meant to extend the jurisdiction of the SWMC to wastewater, or sewage, treatment facilities, at all, and that the plants referred to are those installations which treat industrial or commercial waste in a way which generates sludge which in turn is disposed of as solid waste. Since much of that kind of sludge can be expected to be deposited eventually in the SWMC's central landfill, it would be appropriate to include it in the definition of solid waste. Not only that, the defendants argue, this kind of sludge is supposed to be kept out of the sewage disposal systems served by its treatment facilities.
Furthermore, and most important, there is a specific exclusion in the statutory definition for "solids or dissolved materials in domestic sewage." It is true that this substance is not called "sewage sludge" in this section, but that precise term is not used either in the main definition or in the exclusion. To gain some insight into a resolution of this issue it is necessary to consider the sewage which the Commission treats. Based on the record, after the large debris has been screened out of the sewage entering the Commission's facilities, it is more than 99% water, and is appropriately called wastewater. Through various clarifying and settling processes some of the solid materials in the wastewater are concentrated and separated out of the treatment stream, which ultimately discharges clarified and and disinfected water into the Providence River, an extension of Narragansett Bay. This residue extracted from the wastewater stream is called sludge, which is described as having a semi-solid consistency, but still containing 75 to 80% water. It remains, essentially, solids, together with a substantial amount of dissolved material in what still is sewage. The use of the word "domestic" to modify sewage in the exclusion would ordinarily present a problem in a State enactment. It could be considered to limit the sewage referred to in the exclusion to "residential" sewage. As pointed out, however, by the defendants, this exclusion echoes an exclusion in the Federal Act most pertinent to management of solid waste disposal. See42 U.S.C. § 6902(27) (Resource Conservation and Recovery Act of 1976)
(RCRA). The use of the word "domestic" in Federal legislation is meaningful as distinguishing domestic from foreign matters.
The defendants show, moreover, that in the Federal regulatory scheme the disposal of sewage sludge is regulated by other legislation. 33 U.S.C. § 1345. Incineration of sewage sludge is regulated in 40 C.F.R. §§ 503.40 thru 503.48, under authority of33 U.S.C. § 1313 (Clean Air Act). This being so, it is understandable that solids or dissolved materials in domestic sewage is excluded both from RCRA and SWMCA.
The plaintiff responds that the General Assembly knew how to incorporate "sewage sludge" into an exclusion from a statutory definition of solid waste. He points to § 23-18.9-7(1), where "solid waste" does not include "solids or dissolved material in domestic sewage or sewage sludge." His argument depends on the "or" in the operative clause being disjunctive, separating disparate elements rather than conjunctive, combining identical elements. The word "or" may be used in the sense of "otherwise known as," as in "Washington County or South County." In this sense "sewage sludge" is just another name for "solids or dissolved material in domestic sewage." The Court notes that under the Regulations promulgated pursuant to RCRA sewage sludge may be dealt with as if it were defined as solid waste, if it is disposed of in a solid waste disposal facility.
The Attorney-general, nonetheless, argues that the "sludge" included in the definition in § 23-19-5(9) refers to the sewage sludge which is burned now, and is proposed to be burned in the future by the defendants. He distinguishes between the planning and the operational functions of the SWMC. As to its operations, like the Commission, it is subject to regulation by the department of environmental management pursuant to §§23-18.9.1, et seq. In that respect, he concedes that there is no need to include sewage sludge within the operational authority of the SWMC.
He contends that the SWMC's planning authority is broader than its operational mandate from the state. In order to carry out its broad planning mandate a broad definition of solid waste is desirable. As a result of his argument, for operational purposes sewage sludge is not solid waste, but for planning purposes it is.
The Plan
The clear language of § 23-19-4(b) has required that the SWMC prepare and implement "a plan for an integrated statewide system of solid waste management facilities" since 1974. Neither party presented any evidence of the preparation, let alone implementation, of such a plan in the last twenty years. Presumably, if such a plan existed, and it touched or failed to touch the subject of sewage sludge, one side or the other would have produced it. For the purposes of this litigation, the Court will infer that this plan has not been prepared, and, consequently, not reviewed and adopted as an element of the State guide plan by the State planning council. In short, this plan does not exist.
The plaintiff insists that the plan referred to in §23-19-4(b) is the same plan as mentioned in § 23-19-11. That plan is called "a statewide resource recovery system development plan." This requirement, too, has been in effect for over twenty years. Like the plan referred to in § 23-19-4(b), whether or not they are the same plan, it, too, is non-existent. Section23-19-11(2) requires that this plan conform with the applicable provisions of the state guide plan, which would obviously be the plan reviewed and adopted by the state planning council pursuant to § 23-19-4(b). In other words, if the two plans are one and the same, they are required to conform with each other.
It is plain from any reading of the two sections that the plan, or plans, will deal with activities in the future, presumably after the plans are adopted. The operative language of§ 23-19-4(b) uses the future tense in barring construction of public facilities. While it could mean there would be no further construction after enactment of the section, a more reasonable reading would be that there would be no such construction after the plan is adopted, if ever it is. Section 23-19-11 clearly refers to the future needs of the state and its municipalities.Sub-Section 23-19-11(4)(A) refers to "future solid waste facilities;" sub-part (B) of the same sub-section refers to "a given time from;" sub-part (C) refers to "phasing in;" andsub-part (D) refers to "Future solid waste disposal facilities." Sub-section (5) makes clear that the futurity referred to in this section means after the promulgation of the plan, because it deals with interim authority of the SWMC to develop component facilities, and provides that "uponcompletion of the plan, all projects of the corporation (the SWMC) undertaken thereafter shall be in conformity therewith." (Emphasis supplied). Accordingly, it is not altogether clear when the ban on incineration of solid waste in§ 23-19-11(7) takes effect with respect to construction. If the General Assembly had intended to ban the construction of all waste incinerators, including sewage sludge incinerators, at the time of passage of this sub-section, it certainly chose an awkward way to do so.
In effect, the plaintiff asks the Court to do what the General Assembly has not done: ban the construction of a sewage sludge incinerator. The Court is mindful that there is vigorous on-going, responsible dispute regarding the environmental consequences, as well as economic desirability of burning sewage sludge. The public health, safety and welfare issues involved in that dispute are not before the Court in this case. This case does not ride on public policy considerations; it involves questions only of statutory construction. The Court is also mindful of § 23-19-29, which requires that the SWMCA be liberally construed. The General Assembly is in session. If it wishes to ban the incineration of sewage sludge, to the extent it can do so constitutionally, nothing stands in its way.
Public Facility
Constitutional implications require that regulatory statutes, like the SWMCA, distinguish between public facilities and private facilities. It seems reasonably clear that public facilities as used in the SWMCA means facilities owned by the state, or one of its agencies, including municipalities. The SWMC, itself, is a prime example of a public owner as is fairly clearly set out in§ 23-19-6. It also seems equally clear from §§ 46-25-4 and46-25-6 that the Commission is also a public body.
Considerable evidence was introduced at the hearing as to whether the proposed facility was a "public" facility or a "private" facility. Since § 23-19-4(b) limits the construction of public facilities, if the proposed incinerator is a "private" facility, the limitation will not affect it. The existence of privately-owned solid waste management facilities is obviously contemplated by § 23-18.9-8.1, as well as § 23-19-11.1.
In order to determine whether the proposed incinerators are public or private facilities, the proposed contract must once again be scrupulously analyzed. It cannot be disputed that the currently inoperative 1948 incinerator and the MHU presently burning sewage sludge are both public facilities. The question is whether or not implementation of the challenged agreement will convert them to private facilities as to which no need under §23-19-4(b) needs to be shown.
Under § 46-25-5(d) the Commission is empowered: "To make and execute agreements of lease, construction contracts, operation contracts, and all other contracts and instruments necessary or convenient in the exercise of the powers and functions of the commission granted by this chapter." Part Two of the proposed agreement specifies that the Commission will grant a leasehold interest to NETCO-ER in the premises in which it will carry on its sewage sludge treatment activity. The lease has a specific, if nominal, rent. It has a specific term. The leasehold is specifically and definitely described. The improvements to the leasehold, called "the NETCO-ER Project" in the proposed agreement, are declared to be owned by NETCO-ER. These improvements are specifically held to include the two proposed incinerators: the TCU and the up-graded MHU. The Commission will pay a "tipping fee" to NETCO-ER for burning its sewage sludge. NETCO-ER may receive and burn sewage sludge from other generators than the Commission with the consent of the Commission. NETCO-ER is required to share the revenues it receives for disposing of "outside sludge" with the Commission and to pay to the Commission a fee for the sale of ash by-products from its incinerators. All of these provisions are indicia which mark out NETCO-ER's activity as that of a private entrepreneur carrying on business with a public corporation. The defendants accordingly urge the Court to find that the two incinerators are private facilities, even if they carry on public business.
The Attorney-general points to the Commission's enabling legislation. Section 46-25-2(e) contains the following legislative finding:
 "It is further found and declared that the most effective and efficient method to combat the discharge of pollutants in the Narragansett Bay is to create a Narragansett Bay water quality management district commission, to be charged with the acquisition, planning, construction, financing, extension, improvement, and operation and maintenance of publicly owned sewage treatment facilities in the Narragansett Bay water quality management district, with appropriate provision for a portion of the financing of the activities to be undertaken by the pledging of the full faith and credit of the state of Rhode Island."
 (Emphasis supplied).
Section 46-25-4(a) specifically provides:
 "There is hereby authorized, created, and established a public corporation of the state having a distinct legal existence from the state and not constituting a department of state government to be known as `The Narragansett Bay Water Quality Management District Commission', with such powers as are set forth in this chapter, for the purposes of acquiring, planning, constructing, extending, improving, and operating and maintaining publicly owned sewage treatment facilities in the district."
 (Emphasis provided).
The Attorney-general also argues that the Commission's power to execute contracts under § 46-25-5(d) does not permit it to avoid its responsibility to the public it serves.
To the defendants' argument that NETCO-ER would be required to obtain the financing it needs for construction at the risk of its own investment, and that it would be required to recover its own operating costs and any profit from its revenues, that Attorney-general points out that the ultimate source of the revenues with which it will retire its bonded indebtedness, pay its expenses and derive its revenues will be the public rate-payers to the Commission for its sewage treatment as well as disposal operations.
Construction
No one can reasonably argue that NETCO-ER would not be constructing a facility, if it were to build the proposed TCU in the leased premises under the proposed agreement. The defendants do not take such a position.
They do argue, nonetheless, that the work NETCO-ER proposes to do under the draft interim agreement alone does not involve the construction of a public facility. The defendants begin by pointing out that the Attorney-general has eschewed any claim that the existing MHU and its operation is subject to regulation or control by the SWMC. They next argue that all the interim service contract proposes to do is to improve the emission control elements of the incinerator so that it can consume more sewage sludge without violating air quality standards. The Attorney-general contends that any improvement of a facility which increases its permissible capacity is the "construction" of a facility for which a "need" must be shown to satisfy §23-19-4(b).
Findings of Fact
After review of the evidence and the learned and persuasive memoranda of the parties, and based on the foregoing analysis of the arguments of the parties, the Court finds that a clear preponderance of the evidence compels the finding of the following facts:
1. The sewage sludge, which is proposed to be burned by NETCO-ER in the incinerators at Field's Point, consists of solids and dissolved material in domestic sewage in a more concentrated form after treatment of wastewater and de-watering.
2. Sewage sludge is not sludge from a waste treatment plant. It is sludge from a wastewater treatment plant.
3. No plan for an integrated statewide system of solid waste management facilities has ever been prepared or implemented by the SWMC, nor has any such plan ever been reviewed or adopted as an element of the State guide plan by the State planning council.
4. The SWMC has not prepared any statewide resource recovery system development plan, which conforms with any applicable provisions of the State guide plan.
5. The two incinerators which NETCO-ER proposes to operate at Field's Point are public facilities.
6. The TCU will be constructed by NETCO-ER.
7. The up-grading of the emission control system of the existing MHU is not the construction of a facility.
Conclusions of Law
1. The sewage sludge which the defendants now burn at Field's Point as well as the sewage sludge they propose to burn in the incinerators on that site is not solid waste as that term is used in the SWMCA, §§ 23-19-1, et seq., as amended.
2. The sewage sludge incinerators referred to in the proposed agreement are not subject to the plan referred to in §23-19-4(b)
3. The ban on the construction of public facilities in §23-19-4(b) will not take effect until and unless the plan referred to in that subsection has been reviewed and adopted as an element of the State guide plan by the State planning Council.
4. The requirement of the establishment of need in §23-19-4(b) does not apply to the proposed construction in the agreement because no plan has been, prepared, implemented, reviewed or adopted as required by that subsection.
5. The requirement of the establishment of such need does not apply to the proposed construction because the incinerators involved are not solid waste management facilities.
6. None of the provisions of the SWMCA were intended by the General Assembly to apply to the activity of the Commission in the treatment and disposal of wastewater pursuant to the Narragansett Bay Water Quality Management District Commission Act, §§ 46-25-1, et seq., as amended.
7. The exclusion of solid waste incineration mentioned in §23-19-11(7) from the plan described in § 23-19-11(1) does not apply to the construction of sewage sludge incinerators by or on behalf of the Commission as part of its sewage treatment facilities pursuant to § 46-25-5(o).
8. No issue of the environmental impact or the economic feasibility of the proposed agreement is raised or decided in this proceeding.
Accordingly the plaintiff's complaint seeking declaratory and injunctive relief is denied. Interlocutory orders entered heretofore are vacated.
The defendants will present a form of judgment for entry upon notice to the plaintiff.